O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　　　v.<br><br>JOHN GREENE,<br><br>　　　　　　　　　　Defendant. | Case No.:  2:23-cr-00426-MEMF<br><br>**ORDER GRANTING MOTION TO SUPPRESS EVIDENCE [ECF NO. 27]** |

Before the Court is the Motion to Suppress Evidence filed by Defendant John Greene. For the reasons stated herein, the Court hereby GRANTS the Motion to Suppress Evidence.

**I.     Background**

　　**A.  Factual Background**

　　　　i.   The 911 calls concerning Greene.

In July 2023, Defendant John Greene ("Greene") worked as a security guard for multiple businesses. ECF No. 27-1 ("Greene Decl."), ¶ 2. On July 2, 2023, Greene had a shift at a night club called "Wall Street" from 12:00 a.m. to 6:00 a.m. *Id.* After completing his shift, Greene left Wall Street sometime between 6:00 a.m. and 7:00 a.m. *Id.* Greene was scheduled to work a shift from

1

8:00 a.m. to 6:00 p.m. at another location in Chino, California. *Id.* ¶ 3. Between these two shifts, Greene stopped at a gas station located on Laurel Canyon to purchase a couple of energy drinks. *Id.* ¶ 4.

At around 8:00 a.m. on July 2, 2023, a 911 operator received a call from a woman who provided her name. ECF No. 34-3 ("Exhibit 1") at 7:59:06. The woman notified the operator that a man was parked at a 76 Gas Station on Laurel Canyon in a "weird" manner that obstructed the electric vehicle charging stations (and the vehicles parked at these stations).[1] ECF No. 34-4 ("Exhibit 2") at 00:30–00:37, 01:37, 01:47. The woman told the 911 operator that the man had been parked there for a while, and she did not know if he was drunk or if he had been parked there all night. *Id.* at 00:18–00:44. The 911 operator asked the woman if the man was conscious. *Id.* at 00:44–00:48. The woman told the operator that when she knocked on the window, the man woke up and appeared dazed before going back to sleep. *Id.* at 00:48–01:06. The operator asked the woman if the operator should send an ambulance, and the woman said she did not know, and that when she knocked on the window, it seemed that the man was asleep. *Id.* at 01:07–01:30. The operator asked the woman if the car was running, and the woman said that the car was not running and identified the vehicle as a rust-orange-colored Dodge. *Id.* at 01:30–02:25. The woman also provided the operator with the car's license plate number. *Id.*

At approximately 8:01 a.m., a 911 operator received a call from another individual reporting a man inside a vehicle. Exhibit 1 at 08:01:49. This unnamed individual stated that he was calling from a gas station located at 4654 Laurel Canyon and that the man, who was in his vehicle, was either intoxicated, inebriated, or asleep. ECF No. 34-5 ("Exhibit 3") at 00:17–00:28. The caller told the 911 operator that the caller did not want to see the man drive when the man woke up. *Id.* at 00:28–00:32. The operator asked if the man was behind the wheel, and the caller confirmed that he was. *Id.* at 00:37–00:43. The caller had also knocked on the window of the car and described the man as seeming "out of it." *Id.* at 00:43–00:45. The caller stated that he did not want to raise the

---

[1] From the body cam footage video, it appears that, although Greene's vehicle was not parked in a marked parking spot, the cars parked in the electric vehicle charging stations could get in and out of the parking spots. *See* ECF No. 34-6 at 08:14:22, 08:20:52.

man's attention and have the man drive away. *Id.* at 00:45–00:52. The caller confirmed that the vehicle was Dodge sedan and added that it was a rust-colored Challenger. *Id.* at 01:03–01:05.

          ii.   <u>Gomez and Santoyo arrive on the scene.</u>

At around 8:00 a.m. on July 2, 2023, LAPD Officer Isaac Gomez was on patrol in North Hollywood with his partner Officer Pedro Santoyo. ECF No. 34-2 ("Gomez Decl."), ¶ 3. At around 8:10 a.m., Gomez received a Code 2 radio call reporting a "390 man." *Id.* ¶ 4. From Gomez's experience, a Code 390 refers to a drunk driver, and Code 2 is a medium priority code meaning that there is a potential danger to the public and that officers should respond as quickly as possible (but do not need to turn their sirens on). *Id.*

At around 8:13 a.m., Gomez and Santoyo arrived at the gas station in question. *Id.* ¶ 5. Gomez and Santoyo saw an orange Dodge Challenger with the same license plate number identified by the callers parked in an awkward location blocking the electric vehicle charging stations. *Id.* Gomez and Santoyo approached Greene's vehicle, and while Santoyo stayed at front of the vehicle (by the hood), Gomez went over to the driver-side window. ECF No. 34-6 ("Exhibit 4") at 08:14:05–08:14:51. Gomez then knocked on the driver's window of Greene's car while Santoyo knocked on the hood of Greene's car. *Id.* at 08:14:53. Greene did not respond. A few seconds later, Gomez opened the driver-side door of Greene's car, announcing, "Hey, police." *Id.* at 08:14:59; Gomez Decl. ¶ 7. Greene was reclined in his seat with a shirt covering his face. *Id.* Greene did not respond, at which point either Gomez or Santoyo said, "Yo." *Id.* at 08:15:00–08:15:05. Greene then woke up and lifted a t-shirt covering his face. *Id.* at 08:15:05. The officers asked Greene what he was doing and whether he was "good," to which Greene responded, "Yeah." *Id.* at 08:15:05–08:15:11. The back of Greene's shirt was visible and had the word "SECURITY" written in upper case letters. *Id.* at 08:15:11.

Greene proceeded to put his cap on, at which point one of the officers asked Greene, "Fall asleep or what?" *Id.* at 08:15:11–08:15:23. Gomez then asked Greene to step out of the car a couple of times in rapid succession and walked towards Greene, standing between Greene and the driver-side door. *Id.* at 08:15:24–08:15:27. Greene leaned towards the driver-side door, reaching his left arm to grab the handle. *Id.* at 08:15:27–08:15:29. Gomez again asked Greene to step out of the car,

to which Greene responded, "Alright, alright, alright," while keeping his hand on the driver-side door handle. *Id.* at 08:15:30–08:15:33. Gomez commanded Greene to "Step out of the car before you [Greene] get tased." *Id.* at 08:15:34. Gomez loosened Greene's grip from the driver-side door handle and repeatedly commanded Greene to exit the vehicle, while Greene repeatedly answered either "Okay" or "Alright." *Id.* at 08:15:35–08:15:49. At one point during this exchange, Greene looked towards the passenger seat, and Gomez said, "Don't reach for anything or you will get shot." *Id.* at 08:15:50–08:15:54.[2]

Both Gomez and Santoyo asked Greene to exit the vehicle again, and Greene told the officers that "All you [the officers] gotta do is close the door I'm good, I do this every day." *Id.* at 08:16:07–08:16:10. The officers told Greene to exit the vehicle a few more times, and every time Greene attempted to speak to the officers, the officers said "Stop." *Id.* at 08:16:10–08:16:20. Greene then put his right hand on the transmission, prompting Gomez to ask Santoyo to grab Greene's arm because Green was about to "take off." *Id.* at 08:16:20–08:16:36. During that statement, Greene removed his hand from the transmission and said he was not about to "take off." *Id.*

After asking Greene to exit the vehicle multiple times, Santoyo and Gomez grabbed Greene's arms and began pulling him out of the car. *Id.* at 08:16:37–08:16:54. As the officers pulled his arms, Greene asked Santoyo and Gomez "Why are you doing me [Greene] like that." *Id.* Santoyo and Gomez informed Greene that people had called 911 to report that Greene was asleep in the middle of the parking lot. *Id.* Greene again told Santoyo and Gomez that he was "good," and that all they had to do was let him go so he could "pull off." *Id.* at 08:16:55–08:16:59. Santoyo and Gomez then told Greene that Greene could not leave because he was detained. *Id.* at 08:17:00–08:18:18. Greene asked Gomez and Santoyo who he was detained by, at which point Gomez and Santoyo yelled "by us, police." *Id.* Gomez and Santoyo then successfully pulled Greene out of the vehicle and handcuffed him. *Id.* at 08:17:18–08:17:46.

---

[2] From Gomez's body cam footage, it is not apparent if Greene only looks to the right or if his right arm makes any movement towards the passenger seat. In his declaration, Greene testifies that he understood that the officers were asking Greene to remove his seatbelt and exit the vehicle, which Greene could only do by clicking the seat belt connector located to his right. ECF No. 27-1 at ¶ 10. In his declaration, Gomez testifies that Greene "made several movements towards the driver's side seatbelt clip," but also testifies that Greene made movements towards the center console and shifter with his right hand as well. Gomez Decl. ¶ 9.

4


As Santoyo held Greene, Gomez patted down Greene and asked Greene if he had any identification. *Id.* at 08:18:02–08:18:22. Gomez walked over to Greene's car, at which point Greene said, "Center console." *Id.* at 08:18:31–08:18:34. Gomez opened the center console and began looking around. *Id.* at 08:18:34–08:18:43. After a brief search of the center console, Gomez grabbed the right edge of the driver's seat with his hand, moving it slightly toward him. *Id.* at 08:18:43. A few seconds later, Gomez leaned back out of the car and told Santoyo that there was a gun in the vehicle. *Id.* at 08:18:47. Shortly thereafter, another police vehicle pulled up next to Gomez and Santoyo's patrol car. *Id.* at 08:19:13. Two officers exited the second patrol car and began walking towards Gomez, Santoyo, and Greene. *Id.* at 08:19:14–08:19:35.[3] After procuring an evidence bag, Gomez went back to Greene's vehicle and took the gun he had found, bagging it. *Id.* at 08:20:39–08:21:05. Two other unidentified officers arrived at the scene during these events. *Id.* Gomez began talking to one of the unidentified officers and said, "[Expletive] guy is like[4] and then he's trying to turn and go into drive, so I was like [expletive] we gotta drag him out." *Id.* at 8:21:27–08:21:32.

A little under a minute later, Gomez began searching the rest of Greene's vehicle, starting with the driver's side, then moving to search the passenger side of the vehicle. *Id.* at 08:22:04–08:25:03. Gomez again asked Greene where his identification was and looked through the dashboard storage compartment on the passenger side, as well as the rear seats of the car. *Id.* Gomez then opened the trunk and began searching the trunk of the car. *Id.* At that point, Greene told Gomez that "Y'all got the gun already." *Id.* Gomez responded that he had to "make sure" and could not take Greene's word for it. *Id.* Gomez then continued searching the trunk. *Id.* Gomez also told Greene he could not find Greene's identification, and Greene, again, told Gomez to check the center console. *Id.* Gomez again searched the center console, pulling out Greene's wallet and found Greene's identification. *Id.* Gomez asked Greene if he had a guard card, and Greene responded that he did. *Id.*

Gomez took Greene's identification and ran it through the LAPD's database. *Id.* at 08:25:33–08:28:00. After running Greene's information through the database, Gomez said, to an unidentified

---

[3] As Greene, Gomez, and Santoyo were standing after Gomez found the gun in Greene's car, Greene can be heard telling Santoyo that he finished a shift and works as a security guard. Exhibit 4 at 08:19:12–08:19:15.

[4] Gomez takes a pause after "like" and it is unclear if he makes some physical gesture at this point.

officer by him, "He has a guard card, he's got five felony convictions." *Id.* at 08:28:01. The unidentified officer and Gomez exchanged a few words in Spanish. *Id.* at 08:28:07. Gomez then walked back towards Greene and informed Greene of his right to remain silent. *Id.* at 08:29:38.

### B. Procedural History

On August 29, 2023, Greene was indicted for knowingly possessing a firearm while knowing that he had been previously convicted of at least one felony under 18 U.S.C. § 922(g)(1). Indictment, ECF No. 1.

On January 25, 2024, Greene filed the instant Motion to Suppress. ECF No. 27 ("Motion" or "Mot."). The Government filed its amended opposition on February 15, 2024. ECF No. 34 ("Opposition" or "Opp'n").[5] On April 18, 2024, the Government filed a Notice of Authority. ECF No. 48.

On April 22, 2024, the Court ordered an evidentiary hearing on the Motion. ECF No. 49.[6] The hearing on the Motion, and the evidentiary hearing, were held on April 24, 2024.

## II. Applicable Law

The Fourth Amendment protects people and their effects from unreasonable searches and seizures. U.S. Const. amend. IV. With limited exceptions, a search is unreasonable when law enforcement agents search a person or their possessions without a judicial warrant or individualized suspicion of wrongdoing. *United States v. McCarty*, 648 F.3d 820, 830 (9th Cir. 2011), as amended (Sept. 9, 2011). "The government bears the burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement." *United States v. Job*, 871 F.3d 852, 860 (9th Cir. 2017). The controlling standard of proof is by a preponderance of the evidence. *United States v. Matlock*, 94 S. Ct. 988, 996 n.14 (1974).

/ / /

/ / /

/ / /

---

[5] The Government filed its initial opposition earlier that same day, but re-filed the opposition because the exhibits were not all attached. *See* ECF Nos. 31–33.

[6] Due to a technical error, the Court's order did not appear on the docket until April 24, 2024.

### III. Discussion

Here, the parties do not dispute that the police did not have a warrant to detain Greene or search him or his vehicle. Instead, the dispute centers solely around whether the gun the officers found in Greene's vehicle was the product of an unlawful search and seizure—that is, whether the search and seizure at issue falls within an exception to the Fourth Amendment's warrant requirement.[7]

"The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Navarette v. California*, 572 U.S. 393, 396 (2014). To show reasonable suspicion, "an officer must be able to articulate facts creating grounds to suspect that criminal activity 'may be afoot.'" *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1020 (9th Cir. 2009). A court determining whether an officer had reasonable suspicion for an investigative stop examines the totality of the circumstances at the time of the stop. *Navarette*, 572 U.S. at 396; *see Ramirez*, 560 F.3d at 1020–21 ("In this case, because the parties do not dispute that a seizure occurred for Fourth Amendment purposes when Montez ordered Ramirez out of his car, we evaluate the detention's constitutionality by considering the totality of the circumstances at that point."). While reasonable suspicion requires more than a "hunch," it requires "considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id.* (internal quotation marks omitted).

---

[7] The government begins its argument by attempting to establish that Gomez had reasonable suspicion to conduct an investigatory stop. Greene's Motion focuses solely on whether Gomez's *search* was constitutional, and Greene does not address whether the investigatory stop itself was unconstitutional in his Motion (nor did Greene file a reply addressing the issue of whether Gomez's detention of Greene was constitutional). In fact, it appeared from Greene's Motion that Greene did not contest that the investigatory stop was lawful. *See* Mot. at 10 ("The nature of law enforcement's contact with Mr. Greene only became criminal and investigatory in nature upon officers' viewing the baton on Mr. Greene's front seat. The issue, then, becomes whether viewing the baton creates probable cause to extend the investigatory stop beyond the time necessary to issue a traffic citation"), 6–9 (Gomez did not have probable cause to search Greene's vehicle and the automobile exception does not apply). At the hearing, however, Gomez asserted that the stop began when he knocked on Greene's window and therefore the Court analyzes whether Gomez and Santoyo had reasonable suspicion to conduct an investigatory stop.

The Government argues that Gomez had reasonable suspicion to conduct an investigative stop based on the 911 calls.[8] Opp'n at 8. A tip on a 911 call "may generate reasonable suspicion . . . when, under the 'totality-of-the-circumstances,' it possesses two features . . . . First, the tip must exhibit sufficient indica of reliability, and second, it must provide information on potentially illegal activity serious enough to justify a stop." *United States v. Vandergroen*, 964 F.3d 876, 879 (9th Cir. 2020) (internal citation omitted). "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *U.S. v. Cortez*, 449 U.S. 411, 417 (1981).

### A. The 911 Calls Were Reliable Tips

The Supreme Court and the Ninth Circuit have identified several factors that demonstrate the reliability of a tip, including whether the tipper is known, reveals the basis of his knowledge, provides detailed predictive information indicating insider knowledge, uses a 911 number rather than a non-emergency tip line, and relays fresh rather than stale knowledge. *Vandergroen*, 964 F.3d at 879–80.

Here, the totality of the circumstances in this case demonstrates that the 911 calls were reliable. The first caller identified herself, providing her name and phone number. *See Florida v. J.L.*, 529 U.S. 266, 270 (2000) (noting that a known informant is more reliable). Next, both callers revealed the basis of their knowledge—they were both at the gas station and had interacted with Greene by knocking on his window and observing his "dazed" state upon briefly waking up. *See Illinois v. Gates*, 462 U.S. 213, 234 (1983) ("[An informant's] explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case"). This also plays into the "freshness" of the callers' knowledge—that is, both callers described events they were eyewitnesses to shortly after observing the events. *See Navarette*, 572 U.S. at 399–400 (noting that contemporaneous reporting is treated as trustworthy). Both callers also placed their call using the emergency line, which allows called to be recorded and traced, which lends credibility to the tips. *See Navarette*, 572 U.S. at 400 ("A 911 call

---

[8] At the hearing, Officer Gomez testified that, in his view, the stop commenced once Gomez knocked on Greene's door because at that point Greene was not free to leave and was therefore detained.

has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity"). There is nothing on the record before the Court to suggest that the 911 calls were not reliable tips.

### B. The Calls Do Not Create Reasonable Suspicion of Unlawful Behavior

"While the 911 call was thus reliable, it may only support reasonable suspicion if it also 'provide[d] information on potentially illegal activity.'" *Vandergroen*, 964 F.3d at 882 (alterations in original). "Reasonable suspicion depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Navarette*, 572 U.S. at 402.

Here, the Court finds that the 911 calls do not support reasonable suspicion of illegal activity. Both callers reported a *possibly* drunk man *sleeping* in his vehicle. Exhibit 2 at 00:18–00:44, Exhibit 3 at 00:17–00:28; *see also* Exhibit 1[9] at 7:59:06 (dispatch noted that the driver "appears 390 [drunk]."). Moreover, the first caller told the 911 operator that the man's car engine was not running. Exhibit 2 at 01:30–02:25.[10] She also specified that, despite her initial success at waking Greene up, Greene went *back to sleep*. Exhibit 2 at 00:48–01:06. She also told the 911 operator that Greene had been parked for a while, potentially all night, indicating an absence of recent vehicular movement. Exhibit 2 at 00:18–00:44. Although the second, unnamed caller said that he did not want to see Greene on the road once Greene woke up (implying that Greene was asleep), the unnamed caller did not state that Greene was getting up or getting ready to drive. Exhibit 3 at 00:28–00:32. Markedly, neither caller said that they either observed Greene drive to the gas station in his vehicle or prepare to drive away. Both callers said that Greene was asleep in his car and seemed dazed. Being asleep,

---

[9] At the hearing, one of the Government's witnesses, Brandon C. Purece, testified that the comments of the 911 calls as reflected in Exhibit 1 are relayed to the officers, who can read the log from their computers inside their vehicles.

[10] Although some of the details from the calls is not captured in the call log that Gomez saw, *see* Exhibit 1, the Government bases its entire argument that Gomez conducted a lawful stop on the 911 calls in their entirety, a position the Government affirmed at the hearing. *See* Opp'n at 8–11.

dazed, and *possibly* drunk while sleeping in one's car in a parking lot is not criminal activity, nor does it provide more than a hunch that criminal activity could be afoot.[11]

The Government argues that Gomez had reasonable suspicion to believe that Greene was driving under the influence, in violation of California Vehicle Code section 23152. However, the elements of driving under the influence pursuant to Section 23152 are that the defendant (1) *drove* a vehicle; and (2) *while driving*, defendant was under the influence of alcohol and/or narcotics. *See Mercer v. Dep't of Motor Vehicles*, 809 P.2d 404, 414 (1991) ("[W]e conclude that section 23152 requires proof of *volitional movement* of a vehicle.") (emphasis added); Cal. Veh. Code § 23152(a) ("It is unlawful for a person who is under the influence of any alcoholic beverage to *drive* a vehicle.") (emphasis added). There were no facts supporting a reasonable suspicion that Greene was driving under the influence. Considering all the facts together, the Government has not shown that the facts support a particularized reasonable suspicion that Greene was about to or had committed a crime, including driving under the influence pursuant to California law.

Accordingly, the initial investigatory stop was unlawful, and could not justify the subsequent search.[12]

### C. Gomez Did Not Conduct a Lawful Protective Sweep

Although the Court finds that the stop was unlawful, out of an abundance of caution, the Court also addresses the Government's argument that Gomez lawfully conducted a protective sweep.

"[W]hen police have a reasonable belief that [a] suspect poses a danger," the police may conduct a protective sweep. *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). When a suspect is apprehended in his vehicle, the protective sweep encompasses

> the passenger compartment . . . [and] areas in which a weapon may be placed or hidden . . . if the police officer possesses a reasonable belief based on 'specific and

---

[11] The Court notes that under Fourth Amendment law, "[s]o long as the facts known to the officer establish reasonable suspicion to justify an investigatory stop, the stop is lawful even if the officer falsely cites as the basis for the stop a ground that is not supported by reasonable suspicion." *U.S. v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016). Here, the Government only alleges driving under the influence as a basis for the stop at issue. However, as the Court explains, the Court does not find that the 911 calls establish that *any* unlawful activity was afoot.

[12] As discussed, the Government and Gomez asserted the initial stop and subsequent actions were justified by reasonable suspicion of driving under the influence. The Court need not reach the question of whether the Government could have relied upon some other basis for the stop.

10

articulable facts, which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is *dangerous* and . . . *may gain immediate control of weapons*.

*Id.* (emphasis added). Binding law makes clear that the inquiry is an objective one. *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016) ("We emphasize, however, that although our focus is on the objectively reasonable basis for the stop, not the officers' subjective intentions or beliefs, the facts justifying the stop must be known to officers at the time of the stop.").

The Court finds that Gomez did not have a reasonable belief that Greene could be armed and dangerous. Here, the Government argues that Gomez had a reasonable belief to conduct a protective sweep under *Michigan v. Long* because: (1) Gomez saw the baton on the passenger's seat in plain view, and Greene made "furtive" movements towards his right side—the passenger side—before Gomez ordered him out of the car; (2) Gomez knew that armed drivers may have access to other weapons in their vehicle and may conceal these weapons; (3) Greene attempted to flee the scene several times; (4) Gomez knew that a suspect who is under the influence, has contraband, or has an outstanding warrant will attempt to flee; (5) Greene did not comply with Gomez's repeated instructions to exit the vehicle, which Gomez interpreted as an attempt to either flee, fight, arm himself with a weapon, or delay a search of the vehicle; and (6) Gomez knew the nearby area was heavily trafficked and had concerns about public safety. Opp'n at 12.[13]

As an initial matter, the Government has not shown that the baton was visible in plain view prior to the purported protective sweep. The Court did not find Gomez's declaration on this point credible in light of his testimony in court.[14] Although Gomez allegedly noted the baton in plain view, Gomez admitted in his testimony that he did not communicate the presence of the baton to his partner, Santoyo, or mention it to dispatch. *See also generally* Exhibit 4. This is in contrast to Gomez's running commentary throughout the stop on nearly every other matter concerning Greene and the stop.

---

[13] Greene does not address this argument in his Motion but did have an opportunity to address this argument at the hearing on the Motion.

[14] The Court considered Gomez's testimony and his demeanor while testifying in assessing his credibility on all points asserted in his declaration and his testimony in court.

11

Another primary "fact" cited by the Government was that—per Gomez's testimony—the protective sweep was necessary even though Greene was handcuffed because suspects can still return to their vehicles and flee or obtain weapons. The Court did not find this testimony credible, and Gomez's actions were not consistent with this alleged fact. The officers did not move further away from the vehicle to reduce this risk, but continued to detain Greene right next to the open car door with the key in the ignition.[15] Similarly, when Gomez conducted the purported protective sweep, he did not seize or secure the baton. These facts undercut his testimony (and the Government's argument) that a protective sweep was required even though Greene was handcuffed because Greene could reenter his vehicle and have immediate access to the baton. *See Long*, 463 U.S. at 1052 (a protective sweep is appropriate even where a defendant is outside of his vehicle because if the defendant is not placed under arrest, he may be permitted to reenter his vehicle and will have access to any weapons inside); *see also* Exhibit 4 at 08:18:16–08:18:42 (not seizing baton but noting presence of the gun). If the purpose of the "protective sweep" was to protect the officers, it stands to reason that they would secure any weapons observed, and especially the one weapon that allegedly precipitated the sweep.

This highlights an important difference between the circumstances facing Gomez and Santoyo and the circumstances facing the officers in *Long*. In *Long*, the defendant was apparently not handcuffed, and was actually walking towards his car when the officers observed the hunting knife. In fact, the Supreme Court notes that "Long was not frisked until the officers observed that there was a large knife in the interior of the car into which Long was about to reenter." *Long*, 463 U.S. at 1050. Here, Greene was detained with rear handcuffs, being held by Santoyo, and was not in the process of reentering the car. The facts and circumstances also differed significantly from *Vandergroen*—another case relied upon by the Government—in which the police already reasonably believed that the defendant had a gun (based upon 911 reports of a man with a pistol) but had not yet

---

[15] The Court acknowledges that the Supreme Court made clear in *Michigan v. Long* that officers are not required to take alternative measures to avoid a *Terry* intrusion, but the Court finds that the conduct of the officers must be considered in determining what the totality of the circumstances at the time was. Not only did the officers not move Greene away from the car, but their conduct and body language was entirely inconsistent with a belief that Greene was "dangerous" or anything other than what he appeared to be—a man waking from a deep sleep.

12

located it, hence the need for a vehicle search. *Vandergroen*, 817 Fed. Appx. 420, 422–423 (2020) (finding that a warrantless search of a vehicle was justified under *Long* even though the defendant was handcuffed in a police car); see also *Vandergroen*, 964 F.3d at 878–79, 881 (explaining the 911 call as the source of the belief that the defendant had a gun). Here, the police had no such reasonable suspicion of any other weapon, particularly since the baton was at least plausibly explained by Greene's "SECURITY" t-shirt.

Gomez's conduct is inconsistent with a protective sweep in another regard—it appears that what immediately preceded the search through the vehicle was Greene's advisement to Gomez (upon questioning) that his identification was located in the center console. *See* Exhibit 4 at 08:18:16–08:18:42.[16] This suggests that the search for the identification precipitated the search, and it was not a "protective sweep" conducted for the reasons stated.

The other "facts" cited are unsupported and cannot justify a search. For example, one of the facts—that Gomez knew that armed drivers may have access to concealed weapons—cannot support a search because any person, armed or not, could have access to concealed weapons. Concealed weapons are, by their very nature, hidden from view, and as such, without checking, one cannot confirm the existence of a concealed weapon. The Government also relies upon the alleged "fact" that Greene attempted to flee the scene and did not comply with Gomez's instructions. However, this is unsupported by the evidence on the record. Although it is true that Greene asked the officers for permission to leave, he did not try to flee when the officers denied him such permission. In fact, Greene affirmatively denied that he was trying to leave. Exhibit 4 at 08:16:31–08:16:35. Greene also did not fight the officers or act aggressively. *See generally id.* It is true that Greene did not immediately comply with Gomez's instructions to exit his vehicle, but, as Gomez testified, Greene's movements were lethargic, as he had just woken up. Thus, it appears to the Court that Greene was

---

[16] The Government argues that Gomez, after pulling Greene out of the vehicle and handcuffing him, checked the foot area of the driver's seat (before patting Greene down and asking Greene for identification, which leads to the search where Gomez secures the gun). *See* Exhibit 4 at 08:17:49–08:17:52. Although it is true that this brief search was not begun by Gomez's search for Greene's identification, the Court does not find that this brief search outweighs the issues the Court has identified—namely, that although the Government claims Gomez had reasonable suspicion based on the presence of the baton, the baton did not factor into to the so-called "protective sweep," and as such, Gomez did not have a reasonable belief that Greene was armed and dangerous.

not acting defiantly, as the Government argues he was. And the video shows no furtive movements as alleged.

Next, Gomez's knowledge that a suspect who is under the influence, has contraband, or has an outstanding warrant will attempt to flee cannot justify the search. It seems that the Government's argument was that Greene's alleged attempt to flee showed that he was either under the influence, had contraband, or had an outstanding warrant; and any of those conditions would justify a protective sweep. This does not hold. First, the objective facts were not those of flight, as discussed above. Second, a protective sweep can only be justified by a reasonable belief that the suspect is armed and dangerous, not that he is merely under the influence, has contraband, or has outstanding warrants.

Finally, that the nearby area was heavily trafficked appears unsupported by the evidence—the video shows very little vehicle or pedestrian traffic—and the fact that Gomez had concerns about public safety is a generalized fact that is always true and therefore cannot support a search.

Even assuming the baton was in plain view, the objective facts were that officers received reports of a sleeping man in a vehicle, and observed a sleeping man in a vehicle with a "SECURITY" t-shirt and a security baton. These objective facts—even when considered in combination with the other facts cited by the Government—do not support a reasonable belief that Greene was armed and dangerous. Taking all of the objective facts known to the officers together, the Court concludes that Gomez did not have reasonable suspicion to believe that Greene was armed and dangerous and that a protective sweep was thus lawful.

### D.  The Exclusionary Rule Does Not Apply

Although the Fourth Amendment protects the right of "the people to be secure in their persons . . . and effects," it does not contain any provision "expressly precluding the use of evidence obtained in violation of its commands[.]" *Herring v. U.S.*, 555 U.S. 135, 139 (2009) (internal quotation marks omitted). "Nonetheless, [the Supreme Court's] decisions establish an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Id.* Thus, the fact that a Fourth Amendment violation occurred does not necessarily mean that the evidence found as a result of the unlawful search or seizure is automatically excluded. *See id.* at 141 ("We have

repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation."). Instead, the exclusionary rule applies where it "results in appreciable deterrence." *Id.* at 141 (cleaned up). Moreover, the "benefits of deterrence must outweigh the costs." *Id.* "When the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, or when their conduct involves only simple, 'isolated' negligence, the 'deterrence rationale loses much of its force,' and exclusion cannot 'pay its way.'" *Davis v. United States*, 564 U.S. 229, 238 (2011) (cleaned up) (citing *Herring*, 55 U.S. at 137 and *United States v. Leon*, 468 U.S. 897, 908, n.6, 909, 919 (1984)). Accordingly, there is a "good-faith exception" to the exclusionary rule that the Government relies upon to argue that even if the Court finds the stop or search unlawful, the Court should not exclude the evidence which resulted.

Here, the Court finds that the good faith exception does not apply because Gomez's conduct was inconsistent with a good faith belief that his conduct was lawful. First, despite testifying that he believed Greene could have been under the influence of some substance, Gomez did not conduct the stop in the same way that he admitted he would do for suspected driving under the influence. He testified that he has conducted traffic stops of drivers he suspected were driving under the influence, and that during these traffic stops, Gomez routinely asks if the driver has consumed alcohol or narcotics, among other questions. However, during the incident at issue, he did not ask Greene any questions concerning consumption of alcohol or narcotics. Second, at various points, Gomez appears to have unnecessarily escalated the situation and behaved in an aggressive manner that appears to have been unjustified. For example, less than thirty seconds after telling Greene to exit the vehicle in rapid succession (and right after Greene had clearly just woken up), Gomez told Greene to exit or risk being tased. Exhibit 4 at 08:15:06–08:15:34. At that point, Greene had not done anything to warrant such a reaction, as Greene had just woken up, and as Gomez admitted at the hearing, appeared lethargic. Similarly, about twenty seconds later, Gomez also threatened to shoot Greene. *Id.* at 08:15:52–08:15:55.

Taking all of this together, the Court finds that Gomez did not hold a good faith belief that the stop and subsequent search were lawful; therefore, the good faith exception does not apply. Moreover, Gomez's actions in conducting the stop and subsequent search were sufficiently

deliberate such that exclusion can deter the same conduct in the future. *See Herring*, 555 U.S. at 144 ("To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by our justice system.").

### IV. Conclusion

For the foregoing reasons, the Court hereby GRANTS the Motion.

IT IS SO ORDERED.

Dated: May 1, 2024

_____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge